# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **JAMAEL SANFORD,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No.: |
| | ) | |
| v. | ) | |
| | ) | |
| **GEORGIA DEPARTMENT OF** | ) | |
| **PUBLIC SAFETY,** and its Division, | ) | |
| the **GEORGIA STATE PATROL,** | ) | |
| **Mark Hambert,** individually and in | ) | |
| his official capacity under color of law | ) | |
| as Major, Georgia State Patrol. | ) | **JURY TRIAL DEMAND** |
| | | |
| Defendants. | | |

## COMPLAINT

Plaintiff, State Trooper Jamael Sanford, files this Complaint against

Defendants Georgia Department of Public Safety (DPS) due to its division

Georgia State Patrol (GSP), and Mark Hambert.

## INTRODUCTION

1.

1

This action is filed under 42 U.S.C. § 1983 for violation of  Jamael Sanford's rights to equal protection under the Fourteenth Amendment of the U.S. Constitution; and using 42 U.S.C. § 2000e, et. seq. for violation of his rights to be free from racial discrimination under Title VII of Civil Rights Act of 1964; an action to remedy violations of Plaintiff's rights under Title I of American Disability Act of 1990 ("ADA"), 42 U.S.C. § 12111,et seq .;and an action for both interference and retaliation in violation of Plaintiff's rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq.

## JURISDICTION AND VENUE

2.

Jurisdiction is proper as this Court has subject matter jurisdiction of the federal claims asserted in this action under 28 U.S.C. §§ 1331 and 1343(a)(4), 1367and 42 U.S.C. § 1983.

3.

Venue is proper under 5 U.S.C. §552(g) (5)(2009) and 28 U.S.C. § 1391(b) and (c) in the Northern District of Georgia with  respect to all claims asserted by Plaintiff because the place and the acts of the Defendant are all located and carried out in the Northern District of Georgia.

## PARTIES

4.

Plaintiff, Jamael Sanford, is an African American male who was employed by Defendant Georgia Department of Public Safety, Georgia State Patrol Division. At all times relevant to this Complaint, Plaintiff is a citizen of the United States and a resident of the state of Georgia. At all times relevant to this Complaint, Sanford was an employee of DPS within the meaning of Title I of American with Disabilities Act of 1990 and §504 of Rehabilitation Act of 1973.Sanford submits himself to the jurisdiction and venue of this Court and is entitled to bring this action under state and federal law for all general, special, and any other permissible damages.

5.

Plaintiff Sanford had been employed with Defendant Georgia Department of Public Safety (DPS) for more than 12 months and worked more than 1250 hours in the 12 months preceding a serious health condition for which he took medical leave.

6.

3

Therefore, Plaintiff Sanford is an "eligible employee" within the meaning of the FMLA, 29 U.S.C. § 2601 et seq.

7.

Defendant Georgia Department of Public Safety, and its Division Georgia State Patrol, is a state government agency or subdivision and is sued as an employer under Plaintiff's legal claims. At the time of the subject event that has given rise to this lawsuit, Defendant Georgia Department of Public Safety was the public employer of Plaintiff Sanford.

8.

DPS has had more than fifty (50) employees within a seventy-five (75) mile radius in each of twenty (20) or more consecutive calendar weeks in the current or preceding year within the meaning of  29 U.S.C. § 2601 et seq.

9.

DPS is an "employer" within the meaning of the FMLA, 29 U.S.C. § 2601 et seq.; within the meaning of Title I of the Americans with Disabilities Act and Section 504 of Rehabilitation Act of 1973; and Title VII of Civil Rights Act.

10.

4

Defendant Mark Hambert, at all times relevant, was a commanding officer with the rank of Major within the Georgia Department of Public Safety, Georgia State Patrol Division. At all times relevant, Hambert had the authority to terminate Trooper Jamael Sanford. At all times relevant, Hambert was responsible for knowing all rules regulation, polices, orders and so forth that applied to his conduct, as well as knowing all laws, including case law, that placed him on notice that his alleged conduct was unlawful. At all times relevant Hambert was acting under color of state law.

## PROCEDURAL REQUIREMENTS
### 11.

Plaintiff has satisfied all procedural requirements prior to commencing this action. September 18, 2019, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against DPS. Plaintiff received  a right to sue letter on August 21, 2020 and files this complaint within ninety (90) days receipt thereof.

## STATEMENT OF FACTS

12.     Trooper Sanford was hired by the Georgia Department of Public Safety on November 20, 2012.

13.      After completing the Police Academy, Trooper Sanford was assigned to Post 51-Gwinnett on July 12, 2013.

14.      Trooper Sanford's direct supervisor was Sgt. Kustra.

15.      Sgt. Kustra treated Sanford differently than his co-workers.

16.      Sanford's co-workers who were not black were treated more favorably than him.

17.      On or about October 6, 2017, Sgt Kustra took away Sanford's off day and sent him to Savannah, Georgia.

18.      Although there were other Troopers available to work the Savannah detail, Sanford was ordered to attend.

19.      Sandford received discipline for not adding passengers' information to vehicle incident reports.

20.      The passengers did not have identification and did not speak English.

21.      The driver also did not report any injuries.

22.      Several white Troopers assigned to Post 51 were not disciplined when they did not add passenger to the incident reports.

23.      Sgt. Kustra would review all of Sanford's video activity but not do the same for his co-workers.

24.     Troopers Sgt. Travis Rinehart, Jeff Teasley, Nick Hamerla, and Cody Brantley who are not black, were treated more favorably than Sanford for similar work performance.

25.     As a Trooper, one duty assignment could be to not patrol and stop cars; but to handle incoming calls.

26.     Typically, if the Trooper also resided in Gwinnett County he would have to be fully dressed and allowed to remain at home unless called out.

27.     Sanford was treated differently because he was ordered to leave home, sit at the office all day, and not return to his home at any point during his shift.

28.     No other Trooper in the same position as Sanford was ordered to sit at the office all day.

29.     Other Troopers who also lived in Gwinnet County would still be at their homes 45 minutes into their shifts.

30.     Trooper Sanford was ordered to check his email everyday even when was on approved vacation.

31.     In March 8, 2018, then Lt. Col David Herring recommended that Trooper Sanford be transferred to Post 46 Monroe.

32.     Major Waldrop, on March 8, 2018, notified Trooper Sanford that he would be transferred to Post 46 Monroe.

33.     At Post 46 Monroe, SFC James Buchanan was Trooper Sanford's immediate supervisor.

34.     Trooper Sanford complained that SFC James Buchanan harassed and treated him unfairly.

35.     While on medical leave, SFC Buchannan sent Trooper Sanford and email.

36.     Buchanan's email to Trooper Sanford stated that that he would receive discipline and his patrol vehicle take home privileges will be suspended for 30 days.

37.     DPS alleges that on April 26 2018 Trooper Sanford was in a motor vehicle crash and failed to report an accident.

38.     The alleged motor vehicle incident occurred on  Bold Springs road at the intersection with the private driveway of 3651 Bold Springs Rd in Monroe GA

39.     On April 26 2018, the day of the alleged motor vehicle crash, the atmospheric conditions where rainy  and the roadways were wet.

40.     Trooper Sanford denied he was in a vehicle crash and therefore did not have to report it.

8

41.     DPS investigation of Trooper Sanford for Case IA-006-2018 ended on December 20, 2018.

42.     On or about May 21, 2018, while patrolling, Trooper Sanford felt a sharp pain in his groin area.

43.     Trooper Sanford discussed the pain with his immediate supervisor SFC Buchanan.

44.     SFC Buchanan informed Trooper Sanford that he may have a hernia.

45.     The following morning, the pain intensified so Trooper Sanford called in sick and went to the doctor.

46.     The doctor recommended that Trooper Sanford get immediate surgery.

47.     Trooper Sanford had surgery the following week.

48.     Trooper Sanford had several serious health complications following his surgery.

49.     Sanford had to get follow up treatment for his hernia which caused pain in his groin area.

50.     Sanford had to get treatment for pain in his back.

51.     Sanford had gastrointestinal problems such as nausea and diarrhea.

9

52.     Sanford was diagnosed severe anxiety

53.     So, he was forced to extend his medical leave.

54.     Trooper Sanford provided the requested medical leave documents to DPS.

55.     Sanford was a qualified individual with a disability as that term is defined by 42 U.S.C. § 12102(1) .

56.     Sanford is an individual with a disability inasmuch as he actually has a physical impairment causing substantial limitation in one or more major life activities, because he has a record of impairment, and because the DPS regarded him as having an impairment.

57.     Sanford is capable of performing the essential functions of his job with or without an accommodation.

58.     Jennifer O'Neal was Trooper Sanford direct contact to whom he provided medical documents and information.

59.     While Trooper Sanford was on medical leave, SFC Buchanan emailed him.

60.     In an email, SFC Buchanan stated that Trooper Sanford had poor communication.

61.     In an email, SFC Buchanan questioned Trooper Sanford ability to follow directions.

62. In an email, SFC Buchanan stated that Trooper Sanford would be subject to disciplinary action when he returned to work.

63. Trooper Sanford complained to DPS that his supervisor SFC James Buchanan was harassing him.

64. Trooper Sanford complained to DPS that his supervisor SFC James Buchanan treated him unfairly.

65. Trooper Sanford complained to DPS that his supervisor SFC James Buchanan should not email him while he is on medical leave.

66. Trooper Sanford complained to DPS that white troopers were treated more fairly than black troopers.

67. While Trooper Sanford was on medical leave, CPL Tommie Young called him on the phone.

68. On August 3, 2018, CPL Young informed Trooper Sanford that he would be at Sanford's home at 4pm.

69. Trooper Sanford informed CPL Young he would not be at home at 4pm.

70. At 4pm on August 3, 2018, CPL Young called Sanford again and told him that he was in front of Sanford's home.

71. Sandford has to rushed home as soon as possible.

72.     Once Sanford arrived at his home, CPL Young request Trooper

Sanford's weapons, badges, and laptop.

73.     Sanford asked CPL Young the reason why he was taking his

weapons, badges, and laptop.

74.     CPL Young responded that it was due to the breakout on Trooper

Sanford's hand and he most likely would have to requalify with his

weapons when Sanford returned back to work.

75.     Several months later, Trooper Sanford was contacted by Internal

Affairs.

76.     While he was on medical leave, DPS through the Internal Affairs

investigation asked Sanford to meet at the Gwinnett County precinct.

77.     Unbeknownst to Sanford, the Internal Affairs meeting was to

question him about the alleged April 26, 2018 motor vehicle crash.

78.     On or about February 15, 2019, Trooper Sanford discover that his

previous two weeks of pay had been removed from his bank account by

DPS.

79.     From February 1-15, 2019 DPS did not notify Sanford that his

family medical leave was exhausted.

80.     On February 18, 2019, Sanford spoke with Selena Langford in

Human Resources.

81.     On February 18, 2019, DPS system showed that Sandford was still on approved medical leave.

82.     On February 18, 2019,DPS system showed that Sanford had paid leave available.

83.     The paid leave would allow Sanford to receive pay while on medical leave.

84.     Sanford also submitted a request for leave donation from other Troopers.

85.     However, DPS did not approve Sanford's request for donated leave.

86.     On or about March 22, 2019, Sanford was on unpaid medical leave.

87.     On or about March 22, 2019, Trooper Sanford was called into the Human Resource department and informed his position was terminated.

88.     On March 22, 2019, DPS, through its agents, gave Trooper Sanford inter-departmental memorandum with the subject "Notice of Proposed Adverse Action."

89.     And in the memorandum dismissal is listed as the adverse action.

13

90.     The memorandum does not provide any explicit reasons for

Trooper Sanford's dismissal.

91.     The effective date of Trooper Sanford's dismissal was April 1,

2019.

<u>**COUNT I**</u>
**42 U.S.C. § 1983—VIOLATION OF FOURTEENTH AMENDMENT
RIGHTS TO EQUAL PROTECTION
(Against All Defendants)**

92.     Plaintiff incorporates by reference all the preceding paragraphs,

and any other facts this Court deems relevant, as if fully stated herein

to support all allegations made in this Count.

93.     The Fourteenth Amendment to the Constitution guarantees that

citizens are entitled to equal protection of the laws and thereby cannot

be discriminated against based on their race, and because 42 U.S.C. §

1983 prohibits state actors such as all Defendants from violating

constitutional rights, Defendants are liable for their unconstitutional

conduct based on the facts incorporated to support this Count I.

Sanford is entitled to all permissible damages under law.

**COUNT II
42 U.S.C. § 2000e, et. seq. ("Title VII") —VIOLATION OF TITLE VII OF
THE CIVIL RIGHTS ACT OF 1964**

**(Against Defendant Georgia Department of Public Safety)**

94.     Plaintiff  incorporates by reference all the preceding paragraphs of the Complaint, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

95.     Based on the facts incorporated to support this Count, Defendant employer Georgia Department of Public Safety violated Trooper Sanford's right to be free of racial discrimination because Defendant Georgia Department of Public Safety's decision to terminate Trooper Sanford's employment was motivated by race, at least in part, if not in whole. Consequently, Plaintiff Sanford is entitled all permissible damages under law.

## COUNT III
## TITLE VII RETALIAITON
**(Against Defendant Georgia Department of Public Safety)**

96.     Plaintiff incorporates by reference all of the preceding paragraphs of the Complaint, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

97.     At all times relevant to this Complaint, Plaintiff Sanford had a

right to be free from violations and deprivations of his constitutionally

secured rights.

98.     Based on the incorporated facts to support this Count,

Defendants retaliated against Plaintiff Sanford because of his prior

protected activity, resulting in his termination. Plaintiff Sanford is

entitled all permissible damages under law.

## COUNT IV
### Interference with FMLA Leave
### (Against All Defendants)

99.     Plaintiff incorporates by reference all of the preceding

paragraphs of the Complaint.

100.     Sanford was an eligible employee with a serious health condition

as that term is defined by the FMLA and the accompanying

regulations, specifically 29 U.S.C. § 2611(11), 29 C.F.R. 825.114.

101.     By terminating Sanford's employment on March 22, 2020,

effective April 1, 2020, continuous emails and calling him,  and not

allowing him to return to the same or equivalent position, Defendants

prevented Sanford from exercising the rights provided to him under

FMLA.

16

102.     Defendants actions in interfering with Sanford's rights under the FMLA were committed with reckless disregard for his right to take up to 12 work weeks of leave for a serious health condition, his right to job restoration, and violated the FMLA, 29 U.S.C. § 2615(a)(1).

103.     The effect of Defendants' actions has been to deprive Plaintiff Sanford of a job, as well as income in the form of wages, health insurance, prospective retirement benefits, social security, and other benefits due to him because of his right to leave under the FMLA.

104.     As a result, Sanford is entitled to both equitable and monetary relief for Defendants' violation of the FMLA, specifically 29 U.S.C. § 2617(a)(1)(A) and (B) – including, but not limited to, back pay, front pay or reinstatement, attorneys' fees and costs of litigation.

105.     Sanford is also entitled to liquidated damages for Defendants' violation of his rights under the FMLA, 29 U.S.C. § 2617(a)(1)(A)(iii) because Defendants' actions in failing to return her to work were willful violations of the FMLA.

**COUNT V**
**Retaliation for Exercise of FMLA Rights**
**(Against All Defendants)**

106.    Plaintiff incorporates by reference all of the preceding paragraphs of the Complaint.

107.    Sanford was an eligible employee with a serious health condition as that term is defined by the FMLA and the accompanying regulations, specifically 29 U.S.C. § 2611(11), 29 C.F.R. § 825.114.

108.    By terminating Sanford's employment, Defendants retaliated against Sanford for exercising his right to take medical leave for a serious health condition as provided by the FMLA.

109.    Defendants' actions in retaliating against Sanford for exercising his rights under the FMLA were committed with reckless disregard for his right to be free from discriminatory treatment for exercising his rights under the FMLA, specifically 29 U.S.C. § 2615(a)(1)(2).

110.    The effect of Defendants' actions has been to deprive Plaintiff Sanford of a job, as well as income in the form of wages, health insurance, prospective retirement benefits, social security, and other benefits due to him because of his right to leave under the FMLA.

111.    As a result, Sanford is entitled to both equitable and monetary relief for Defendants' violation of the FMLA, specifically 29 U.S.C. § 2617(a)(1)(A) and (B) – including, but not limited to, back pay, front pay or reinstatement, attorneys' fees and costs of litigation.

112.    Sanford is also entitled to liquidated damages for Defendants'

violation of his rights under the FMLA, 29 U.S.C. § 2617(a)(1)(A)(iii)

because Defendants' actions in failing to return his to work were willful

violations of the FMLA.

**COUNT VI**
**Violation of ADA – Regarded as Disabled**
**(Against Defendant Georgia Department of Public Safety)**

113.    Sanford incorporates by reference all of the preceding paragraphs

of the Complaint.

114.    At all times relevant hereto, DPS has been subject to the

requirements of Title I of the Americans with Disabilities Act as by the

ADA.  At all times relevant hereto, Plaintiff was an individual with a

disability as defined under the Americans with Disabilities Act, 42

U.S.C. § 12102 (1)(C) inasmuch as he was regarded as a person with an

impairment as defined by the Act.

115.    Moreover, at all times relevant hereto, Sanford has been a

qualified individual with a disability as that term is defined by 42

U.S.C. § 12111 (8) and able to perform the essential functions of the job.

116.     DPS disciplined and terminated Sanford and disciplined more severely that its non-disabled employees.

117.     DPS's actions amount to a violation of Section 102 of the ADA, 42 U.S.C. § 12112, which prohibits discrimination on the basis of disability.

118.     As a direct and proximate result of DPS's intentional discrimination, Sanford has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job-related benefits, including social security, all in an amount to be established at trial.

119.     In addition, DPS's actions have caused, continue to cause, and will cause the Sanford to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses all in an amount to be established at trial.

**COUNT VII**
**<u>Violation of ADA – Actual Disability</u>**
**(Against Defendant Georgia Department of Public Safety)**

120. Sanford incorporates by reference all of the preceding paragraphs of the Complaint.

121. At all times relevant hereto, The City has been subject to the requirements of Title I of the Americans with Disabilities Act as by the ADA.

122. At all times relevant hereto, Sanford was an individual with a disability, herniated groin, back pain, and anxiety, as defined under the Americans with Disabilities Act, 42 U.S.C. § 12102 (1)(A).

123. DPS is aware of Sanford's disability and history and record of disability.

124. Moreover, at all times relevant hereto, Sanford has been a qualified individual with a disability as that term is defined by 42 U.S.C. § 12111 (8) and able to perform the essential functions of his job.

125. DPS disciplined and terminated Sanford and disciplined more severely that its non-disabled employees.

126. DPS's actions amount to a violation of Section 102 of the ADA, 42 U.S.C. § 12112, which prohibits discrimination on the basis of disability.

127. As a direct and proximate result of DPS's intentional discrimination, Sanford has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job-related benefits, including social security, all in an amount to be established at trial.

21

128. In addition, DPS's actions have caused, continue to cause, and will cause the Sanford to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses all in an amount to be established at trial.

## COUNT VIII
## <u>Violation of ADA – Record of Disability</u>
**(Against Defendant Georgia Department of Public Safety)**

129. Sanford incorporates by reference all of the preceding paragraphs of the Complaint.

130. At all times relevant hereto, The City has been subject to the requirements of Title I of the Americans with Disabilities Act as by the ADA.

131. At all times relevant hereto, Sanford was an individual with a disability, herniated groin, back pain, and anxiety, as defined under the Americans with Disabilities Act, 42 U.S.C. § 12102 (1)(A).

132. DPS is aware of Sanford's disability and history and record of disability.

133. Moreover, at all times relevant hereto, Sanford has been a qualified individual with a disability as that term is defined by 42 U.S.C. § 12111 (8) and able to perform the essential functions of his job.

134. DPS disciplined and terminated Sanford and disciplined more severely that its non-disabled employees.

135. DPS's actions amount to a violation of Section 102 of the ADA, 42 U.S.C. § 12112, which prohibits discrimination on the basis of disability.

136. As a direct and proximate result of DPS's intentional discrimination, Sanford has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job-related benefits, including social security, all in an amount to be established at trial.

137. In addition, DPS's actions have caused, continue to cause, and will cause the Sanford to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses all in an amount to be established at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Sanford prays for a trial by jury and requests the following relief:

(a) That process issue and service be had on each Defendant;

(b) That Plaintiff recover all costs of this litigation, including special damages, punitive damages and compensatory damages;

(c) That a jury trial be had on all issues so triable;

(d) a declaratory judgment that Defendant has engaged in unlawful employment practices in violation of the FMLA; ADA, and Title VII.

(e) an injunction prohibiting Defendant from engaging in unlawful employment practices in violation of the FMLA; ADA, and Title VII.

(f) full back pay from the date of Plaintiff's termination, taking into account all raises to which Plaintiff would have been entitled but for his unlawful termination, and all fringe benefits of employment, with prejudgment interest thereon;

(g) liquidated damages pursuant to 29 U.S.C. § 2617;

(h) reinstatement to Plaintiff's former position with Defendant, or in the alternative, front pay to compensate Plaintiff for lost future wages and benefits;

(i) Order Defendant to compensate Plaintiff for mental and emotional damages suffered as a result of Defendant's unlawful and discriminatory acts;

24

(j) Grant to Plaintiff a jury trial on all issues so triable;

(k) Grant to Plaintiff his reasonable attorneys' fee and reasonable expert witness fees together with any and all other costs associated with this action as provided by 42 U.S.C. § 12117 (a)(as ); and

(l)grant  Plaintiff receives such other and further relief as the Court deems just and proper.

Respectfully submitted this 5th  day of November, 2020.

/s/ Tamika Sykes
Tamika Sykes
Attorney for Plaintiff
Georgia Bar No. 141617
tamikasykes@sykeslawllc.com

Sykes Law LLC

1700 Northside Dr.
Suite #A7-532
Atlanta, GA 30318
(404) 870-8410-Office
(404) 870-8411-Fax
www.sykeslawllc.com